## CONOVER *v.* THE CITY OF CHESTER.

### HECKMAN *v.* SAME.

*(District Court, S. D. New York.  May 5, 1885.)*

1. **COLLISION—RUNNING NEAR PIERS.**
    Ferry-boats passing up and down the East river, and having no call to go in the immediate vicinity of piers 3 to 7, appropriated by law to the special uses of canal-boats, will be held in fault for a collision resulting from attempting to pass between tugs lying off those docks waiting for canal-boats, within 200 or 300 feet of the shore.

2. **SAME—DISSENTING SIGNALS.**
    A signal of two whistles given by a ferry-boat to indicate that she would pass inside, but not assented to, does not relieve her from fault.

3. **SAME—FAULT.**
    A tug in waiting as above, not over 200 or 300 feet from shore, hearing a signal of two whistles, replied with one, and proceeded towards the shore, but, observing that the ferry-boat continued her course inside, backed. *Held,* that the tug was not in fault, and that the ferry-boat was solely responsible for the collision that ensued.

In Admiralty.
*Edward D. McCarthy,* for libelants.
*Beebe & Wilcox,* for claimants.

BROWN, J.  At about half past 7 in the evening of January 3, 1884, the tug-boat Skeer, belonging to the libelant Conover, having the libelant Heckman's canal-barge Hammill lashed to her starboard side, was waiting near pier 7, East river, in the flood-tide, for the tug-boat Amboy, which lay across the slip below, to get out of the way, so that she might pick up another canal-boat in the slip on the southerly side of pier 7. While thus waiting, and, as I find, substantially at rest, the City of Chester, an Annex ferry-boat running from Jersey City to the bridge pier at Brooklyn, rounded the Battery, and, seeing the Skeer ahead, undertook to pass between her and the New York shore. In doing so, she struck the Skeer a violent blow on her port side, and also injured the Hammill by the blow communicated to her.

The City of Chester must be held solely answerable for this collision. The docks near which the Skeer was lying are devoted specially by statute to the use of canal-boats, where tugs are in the habit of picking up and landing such boats, and of making up their tows. The pilot of the City of Chester was familiar with these facts. Tugs lying in this vicinity, whether their colored lights are seen or not,

are presumed to be there on the business of such boats. The statute, moreover, requires that steamers, which includes ferry-boats, in going up the East river shall go as near the middle of the river as may be. There was, in this case, no obstruction, and nothing to prevent the City of Chester from going well out towards the middle of the river. She had no right to be navigating near the shore, having no call there. I think it clear that at no time within five minutes preceding the collision was the Skeer more than 300 or 400 feet out from pier 7. She was probably much less all the time. But even that distance would afford no excuse for the City of Chester to undertake to go inside of her. The ferry-boat was going at the rate of about 10 miles an hour. It was, therefore, not more than from one to two minutes after she was in a position to see the Skeer that the collision happened. When the Skeer was first seen by those on board the City of Chester, they say that the former's colored lights were not visible. If that were true, considering the place where the Skeer was lying, that was no presumptive evidence even that she was in motion; and the proof is clear that she was not, except such slight movements as were necessary to keep her in place. She had previously moved out from the slip between piers 5 and 6, and had then drifted up near to pier 7,—possibly first moving outward a little, and then coming back again. The collision was not over 100 or 200 feet from the pier. It was the business of the City of Chester to keep out in the river, and altogether clear of these tugs near the New York shore. *The Sam Rotan*, 20 FED. REP. 333; *The Active*, 22 FED. REP. 175.

The evidence does not establish any fault in the Skeer. The witnesses of the City of Chester say that they gave a signal of two whistles twice. Various witnesses on the part of the Skeer, several of them disinterested, say that only one signal of two whistles was heard; and that one shortly before the collision, when the boats were about 300 feet apart, to which the Skeer immediately replied with a dissenting signal of one whistle. Whatever doubt there may be whether a previous signal of two whistles had been given or not, it was not heard by any of those about pier 7. Moreover, in the situation in which the City of Chester was at the time when her witnesses say that this first signal of two whistles was given, namely, about off pier 2, the tug-boats about and near to pier 7 could not reasonably suppose such a signal, even if given and heard, to have been designed for them, since they were altogether out of the line of the required course of the City of Chester. The ferry-boat also had no right to change her course towards the shore without a previous assent of two whistles, which she never got, so that her failure to get an answer to her alleged first signal was no inducement and no excuse for her going to the left. When the second signal of two whistles was heard on the Skeer, it was immediately answered with one whistle, and rightly so. *City of Hartford*, 11 Blatchf. 72. The Skeer then started up towards the shore, in conformity with her own whistle, as, in my judgment,

she also ought to have done. The City of Chester, instead of porting to go to the right and out into the river where she belonged, and where both the statute and the inspectors' rules required her to go, persisted in her maneuver to go inside, seeing which, the Skeer then backed, but not in time to avert the collision. In all this, I think, the Skeer did what was required, and all that was reasonably incumbent on her, to avoid the collision.

The case, in most of its features, is similar to that of *The Payne* and *The Vanderbilt*, 20 Fed. Rep. 650, but with even less excuse for the City of Chester than the Payne had in that case. The libelants are entitled to a decree against the City of Chester for the full amount of the damages, with costs; and an order of reference may be taken to compute the amount.